GEM CITY LIFE INSURANCE COMPANY *v.* STRIPLING.

No. 9045.   JANUARY 13, 1933.   REHEARING DENIED FEBRUARY 23, 1933.

*Bryan, Middlebrooks & Carter* and *B. H. Burgess,* for plaintiff.
*Poole & Fraser,* for defendant.

BELL, J.   On January 16, 1929, Gem City Life Insurance Company issued upon the life of Grover Cleveland Ward a policy of insurance in which Mrs. Eva Ward Stripling was named as beneficiary.   After the death of the insured on December 1, 1930, the company filed against Mrs. Stripling a bill in equity in which it sought a cancellation of the policy upon the ground that the insured in his application had made false statements as to several material matters.   The defendant filed an answer in which she contended that the policy was not subject to cancellation for any of the reasons alleged, and in which by way of counter-claim she prayed for a recovery of the face amount of the policy, together with interest, attorney's fees, and damages.   The jury found a verdict in favor of the defendant upon her cross-action, and the insurance company excepted to the overruling of its motion for a new trial.   The verdict amounted to a denial of the equitable relief sought by the plaintiff, and one of the contentions is that the evidence demanded a finding in favor of cancellation.   Besides the usual general grounds, the motion for a new trial contained a number of special grounds complaining of errors alleged to have been committed during the trial.   It was also contended that the verdict in favor of the beneficiary was contrary to the evidence, because it appeared as a matter of law that the insured came to his death by self-destruction or suicide.   The policy provided that in the "event

of self-destruction, whether sane or insane, within two years from the date of this policy, the liability of the company shall be limited to the amount of the premiums paid hereon, and no more." After a thorough consideration of the evidence we have reached the conclusion that the evidence demanded a finding that the insured did commit the act of suicide, as contended by the insurer; and since a ruling to this effect will control the entire case as now presented, no decision will be made upon other questions.

At the time of his death the insured was about 41 years of age, and was employed by his brother, Bartow Ward, in a grocery store in Eufaula, Alabama, and was living in the home of his brother in that city. He was a married man, but had been separated from his wife for several years. A few years before his death he had been in good financial circumstances, but he sustained reverses in business, and at the time of his death was receiving a salary of only $6 per week and board. He would occasionally drink to the extent of intoxication, and was arrested and imprisoned for drunkenness by the marshal of Eufaula on Saturday or Sunday before his death on Monday night. He was released from prison on Monday morning, and his whereabouts was unknown from 10:30 o'clock that morning until shortly before 8 o'clock in the evening, when his brother Bartow in going home saw him on the street, "and he got in the car" and went home with Bartow. Soon after they reached home, Grover Cleveland Ward, the insured, left Bartow and his family and went to his own room. Within a few minutes Mr. and Mrs. Bartow Ward heard a pistol shot, and, on rushing to the room of the insured, found him sitting on the side of the bed, leaning slightly forward, with a fresh bullet hole behind the left ear. The pistol was lying on the bed a few inches from his right hand, and it appeared that one cartridge had been fired. One or more witnesses testified that the insured was right-handed in the use of a hammer and other instruments of like kind. There were powder burns upon the scalp adjacent to the wound, and also upon fingers of both hands. According to the testimony of a physician, the bullet entered the left mastoid bone and "was deflected downward, striking the upper plate of his false teeth," and ranging thence through the neck and into the lungs. The insured was found in the room alone. He died in a few minutes without making any statement, and there was no evidence of any note or writing to explain his death. The

door entering his room from the front hall was slightly ajar, but the windows were supposed to be closed, since it was winter time. The room occupied by the insured was apparently on the same floor with the kitchen or dining-room where Bartow Ward and his family were at supper, being the first floor of the building. None of them heard any noise until the shot was fired, and there was no evidence of any prior struggle or commotion. Nor did the evidence show any cause to suspect violence by some other person. The pistol did not belong to the insured, but was the property of another brother, Arthur Ward, who occupied a different room in the same house. In order to place the pistol beyond the reach of children, Mrs. Bartow Ward had recently laid it upon the mantel in the room of the insured. None of the relatives or associates of the insured knew of any despondency or brooding, and it was distinctly testified that he had given no evidence of unhappiness by reason of the separation between him and his wife. He would occasionally go on fishing trips with his brother Bartow, and when last seen before his death he appeared to be in a normal state of mind. One witness, who qualified as an expert, testified that if there were powder burns in the scalp of the insured, the muzzle of the pistol must have been "around 18 or 20 inches from his head," and that it was not possible "for him to burn his hand [or the outside of his scalp] if the pistol was held right at his head." On cross-examination the same witness testified that he could not "imagine how he [the insured] got the powder burns on his hands," and that he had "seen them when you can't tell how it happened."

The above is a fair resumé of the evidence relating to the issue of suicide. Some other circumstances were detailed by the witnesses, but no fact material to the beneficiary has been omitted from this statement; and it is seemingly unnecessary to quote the testimony. At the beginning of the trial there was a legal presumption against death by suicide, and the insurance company had the burden of rebutting this presumption by evidence. Where the fact of death is established, and the evidence points equally or indifferently to accident or suicide, the theory of accident rather than suicide is to be adopted. *Travelers Ins. Co.* v. *Sheppard*, 85 *Ga.* 751 (12 S. E. 18). The fact of suicide must be established by a preponderance of the evidence, but the presumption against it is not conclusive and will vanish upon proof of physical facts clearly

inconsistent therewith. If the evidence adduced is such as to leave room for no other reasonable inference than that of suicide, the jury can not lawfully return a verdict to the contrary. The questions to be decided in this case are whether the deceased was shot accidentally by himself, or intentionally or accidentally by some one else. Considering the location and range of the wound, together with the facts that powder burns were found upon the scalp and also upon the fingers of both hands of the insured and that the pistol was discovered near his body with one cartridge discharged, we think there was no room for an inference that the insured accidentally shot himself. The facts as thus stated, standing as they do without explanation, point only to a contrary solution, and therefore conclusively rebut any presumption that the insured shot himself accidentally. The same facts will equally disprove an accidental shooting by some other person. It does not appear that any other person was in the room with the insured; but even if the pistol had been held by the hand of another and *accidentally* fired, such other party to the transaction would in all probability have made an alarm and remained to explain the tragedy. It is beyond all reason to suppose that the insured could have been killed in this manner and, at the same time, have been burned upon his scalp and his fingers, as was shown without dispute by the evidence. See, in this connection, *New York Life Ins. Co.* v. *King, 28 Ga. App.* 607 (112 S. E. 383).

Nor was there any evidence from which the jury could have found that the insured was intentionally killed by some other person. There was no evidence of any commotion or struggle, or of any other circumstance to indicate the presence of an intruder, and the evidence as a whole effectively bars any suggestion of an intentional killing by some other person. We have not overlooked the evidence of the witness who testified as an expert that if there were powder burns on the scalp of the deceased "the muzzle of the pistol must have been around 18 or 20 inches from his head." Nor have we ignored the argument "that it is impossible for a man to hold a pistol so that the muzzle of the pistol will be 18 inches away from that portion of the head which is immediately to the rear of his ear, and in such a manner that the bullet when fired from said pistol will range downward." While it is true that the weight to be given to the opinion evidence of an expert is usually a question

for the jury (*Rouse* v. *State,* 135 *Ga.* 227, 69 S. E. 180), a mere theoretical statement of such a witness is insufficient to overthrow the positive and reasonable testimony of honest and unimpeached witnesses as to the existence of physical facts which otherwise demand a different conclusion. In such a case the facts are, as a matter of law, more convincing than theory, and as between the two there is no legitimate basis for a choice on the part of the jury. In *Atlanta & Charlotte Ry. Co.* v. *Gravitt,* 93 *Ga.* 369 (7), 413 (20 S. E. 550, 26 L. R. A. 553, 44 Am. St. R. 145), it was held that the mere opinion of a locomotive engineer that a heavy passenger-train consisting of a locomotive and six cars running down a grade at 40 miles per hour could be stopped within a distance of 100 yards, could not "overthrow the positive and otherwise uncontradicted evidence of the engineer and fireman, who were upon the identical train in question, that all was done which could possibly be done to stop the train, and that nevertheless it was not stopped within a distance of over 400 yards." In 22 Corpus Juris, 733, it is said that "the judgment of an expert, when opposed to undisputed facts and the dictates of common sense, will not support a verdict, and the court should not permit the jury to be influenced by evidence on which they could not, within the laws of correct reasoning, make a finding." See also, in this connection, *Macon & Birmingham Ry. Co.* v. *Revis,* 119 *Ga.* 332, 335 (46 S. E. 418) ; *Atlantic Coast Line R. Co.* v. *Paulk,* 33 *Ga. App.* 293 (2) (125 S. E. 865).

Under the facts of the present case all of the probabilities are one way, pointing to and consistent with the theory of suicide, and inconsistent with any other theory or hypothesis. Other explanations which may occur to the mind will not bear the test of reason and probability, and must be discarded as mere products of the imagination. Where all the testimony relating to a certain question excludes every reasonable inference but one, the issue is resolved into a question of law and may be determined by the court as such. The insured died within two years from the date of the policy, and the evidence demanded the inference of suicide. In such case the liability of the company was limited by the contract to the amount of the premiums paid, and this amount was tendered by the company in the petition filed by it. The verdict in favor of the beneficiary was contrary to the evidence, and as a matter of

law unauthorized. For this reason the court erred in refusing a new trial.

*Judgment reversed. All the Justices concur, except Russell, C. J., and Atkinson, J., who dissent.*